369 So.2d 1128 (1979)
Dewey Joseph LAPEYROUSE as the Administrator of the Estate of his minor child, Dewey Paul Lapeyrouse
v.
PILOT LIFE INSURANCE COMPANY.
No. 12443.
Court of Appeal of Louisiana, First Circuit.
March 5, 1979.
*1129 Michael J. Samanie and Robert L. Barrios, Houma, for plaintiff-appellee.
Carlos E. Lazarus, Jr., Houma, for defendant-appellant.
Before LANDRY, COVINGTON and PONDER, JJ.
COVINGTON, Judge.
The defendant, Pilot Life Insurance Company, has appealed the judgment of the trial court in favor of the plaintiff, Dewey Joseph Lapeyrouse, awarding him $3,270.33 as damages, $3,270.33 as penalties, and $1,500.00 as attorney fees. The judgment also fixed the expert witness fees and taxed them as costs.
This case arises out of a claim under a "24 hour" Scholastic Accident Insurance policy issued by the defendant-appellant. While the policy was in effect, Dewey Paul Lapeyrouse, the minor son of plaintiff, Dewey Joseph Lapeyrouse, sustained an accidental injury on the school grounds when knocked down by an unknown student while at recess at Upper Little Caillou School, Chauvin, Terrebonne Parish, Louisiana. The orthopedic surgeon diagnosed the injury as a slipped capital femoral empiphysis, which necessitated surgery to secure the femoral head to the femoral neck.
On this appeal, the appellant contends that there was no coverage under the insurance policy because medical treatment of the injured student did not commence within thirty days following the date of the accident and that no claim was timely made by the insured. The insurer further contends that the insurance policy excludes from coverage "aggravation of an existing condition." The insurer also urges that the trial court erred in awarding penalties and attorney fees, and in awarding benefits exceeding policy limitations.
There is no merit in the appellant's contention that the medical treatment of young Dewey Paul did not commence within thirty days of the accident. The facts adduced at the trial do not support this contention. The young boy's mother, Mrs. Dewey Lapeyrouse, testified as follows:
"Q. Okay, Mrs. Lapeyrouse, when Dewey came home and told you about the accident did you take him to a doctor?
A. Not at the moment, no.
Q. When did Dewey first see a doctor?
A. The next day.
Q. Which doctor was that?
A. Dr. Spence.
Q. Mrs. Lapeyrouse, do you know when the accident happened? Do you know what day it happened?
A. No, sir.
Q. Okay. And you say that you took Dewey to the doctor the day after the accident happened?
A. As much as I can remember because he was complaining of his knee.
Q. Okay. But it's correct that you really don't remember when he saw Dr. Spence, is that correct?
. . . . . .
A. I sure don't, no sir.
Q. Okay. So your testimony that he saw Dr. Spence the day after the accident probably is . . . you don't know whether that's true or not?
A. No, sir, I don't, but I know it wasn't long after he had, you know . . .
. . . . . .
Q. Mrs. Lapeyrouse, you testified as far as when you brought Dewey to Dr. Spence after the accident . . . you said, it is not long . . . can you pin that down a little bit as to a time span?
A. I know it wasn't long after he had the accident that I brought him to the doctor, but I don't know.
THE COURT:

*1130 Could it have been as long as a week after the accident before you brought him?
THE WITNESS:
It could . . . I doubt if it was a week, I don't think so myself.
THE COURT:
Do you think it was less than a week probably?
THE WITNESS:
Probably so, yes, sir.
THE COURT:
All right."
The testimony of Mrs. Lapeyrouse is corroborated to some extent by the records of Dr. Charles C. Spence, which shows Dr. Spence saw Dewey on November 10th for an injury caused when "some boys jumped on him in school in October during the noon hour," and by the testimony of Bonnie Detiveaux, school secretary, who said the accident was reported to her towards the beginning of school, "in the first six (6) to eight (8) weeks." In addition, the appellant stipulated that the "accident was reported and a claim made," and that it was reported timely.
In Miller v. Marcantel, 221 So.2d 557 (La. App. 3 Cir. 1969), the Court said:
". . . [P]olicy clauses are interpreted in the light of their function and in view of the fundamental purpose of the insuring contract entered into between the parties: to effectuate the substantive coverage intended by the policy, rather than to defeat it by applying technically a clause designed merely to protect the insurer from prejudice, not to trap the insured."
We find these words of the Miller Court peculiarly applicable to the instant set of facts.
We also find no merit in the specification of error that the insured's condition was excluded under the exclusionary clause of the policy, which reads:
"No payment of any kind shall be made for injury, death or any other loss caused, wholly or partly, directly or indirectly by. . . (3) disease or bodily or mental infirmity (or by medical or surgical diagnosis or treatment thereof) including, but not limited to, furuncles (boils), athlete's foot, impetigo or similar skin infection, warts, blisters, allergies, ingrown nails, appendicitis, cardiac disease, diabetes, or aggravation of an existing condition."
Appellant cites this exclusion and states that Dewey Paul Lapeyrouse was suffering from some type of disease or pre-existing condition at the time of his accident. In support of this contention, the appellant cites a definition of "disease" from Taber's Cyclopedic Medical Dictionary, 11th Ed. (1972), and refers to the testimony of Drs. Rhymes and Spence regarding Dewey's condition. A careful reading of the testimony of both doctors indicates that there was no basis for the appellant's denial of coverage on the ground of disease or pre-existing condition.
Dr. Pete H. Rhymes described Dewey's injury as a slipping of epiphyseal plate at the upper end of the femur, the growth area in adolescents where lengthening of the bone occurs. Dr. Rhymes described several factors which contribute to a lack of inherent strength in this area, such as:
1. During adolescence, the epiphyseal plate (growth area) changes from a horizontal to an oblique position. This change in the angle increases the shearing stresses at the femoral neck, making injury of the kind suffered by Dewey more likely to happen;
2. The epiphyseal plate, in adolescent years, is subjected to the predominant influence of growth hormone and undergoes a decrease in its shearing strength. This decrease in shearing strength makes the injury suffered by Dewey more likely to happen;
3. In adolescent years, the periosteum, the membrane covering the bones, undergoes atrophy and thins. This weakening of the periosteum increases the likelihood of the type of injury which Dewey suffered.
The trial court, in order to ascertain the facts regarding Dewey Lapeyrouse's condition, questioned Dr. Rhymes as follows:

*1131 "THE COURT: I think you're both finished. . . we've had recross . . . because I'd like to ask some questions.
Doctor, so that I can fully understand some of the aspects of this . . . first of all, this disease that you describe is it inherent in all males of the age of this boy?
. . . . . .
THE WITNESS: At the end of every bone, particularly in, well, primarily in pre-adolescence and adolescence there is a growth center which contributes to the growth of the bone and to the lengthening of the bone so that we wind up with longer legs and arms when we're adults than we did as babies. Since this is growing and is not bone then it is inherently weaker than bone . . .
THE COURT: . . . All right . . .
THE WITNESS: . . . Therefore it is apt to slip or break . . . we call it a slip . . . basically it is a fracture, it is a break to the growth center . . .
THE COURT: . . . All right . . .
THE WITNESS: . . . And this can occur not only in the hip but it can occur in the fingers and the forearms and the end of any bone, and in a growing child we frequently see this and most, and all orthopedists are concerned that a fracture toward the end of a bone may go through the growth center and interfere with growth. This particular one at the hip as in early life the growth center is more horizontal. . . as we approach adolescence the plane of the growth center changes from horizontal to more vertical.
THE COURT: Almost oblique.
THE WITNESS: So that it is subjected to the shear force.
THE COURT: All right.
THE WITNESS: Across the envelope which encloses the bone in childhood and infancy and up until the mid-twenties it is fairly thick which to some extent gives support to this growth center. As we begin to get into adolescence this envelope tends to thin out until by the time we're in the midtwenties or early thirties it's pretty thin. It's still there but it's relatively thin as we're adults, but in early adolescence it begins to thin out giving less and less support. Growth hormones and usual hormones of adolescence of course affect this growth. All of us have these potentials that this growth center is inherently weak, the angle of the growth line changes as we become adolescents, the periosteum or envelope becomes thinner. If you add some unknown factors . . . extra weight. . . to this then as this changes its angle then the stress has become greater weight above it. If it is a particular type of weight, if it's some type of endocrine dysfunction or abnormality which may influence growth then this obviously could affect this in some way . . . the growth itself. So you begin to add another factor and another factor. We all have this potential of being weak here.
THE COURT: We all have the growth area . . . every child of his age has the growth area in approximately the same place and at approximately the same angle.
THE WITNESS: That's right.
THE COURT: In his case it may well have been aggravated because of his obesity.
THE WITNESS: Right.
THE COURT: All right . . . and it is the, the lack of strength, if you will, in the growth area that you refer to as the disease.
THE WITNESS: That's correct.
THE COURT: So in truth and in fact it is endemic and inherent in all adolescent boys of his age. (Emphasis added).
THE WITNESS: That's correct."
Dr. Charles C. Spence, the Lapeyrouse family physician, testified regarding any *1132 signs of a pre-existing condition in Dewey Lapeyrouse as follows:
"Q. Doctor, you say aggravated, brought on or caused . . . do you know which . . . can you give an opinion as to which one?
A. No . . . uh, I wish I was smart enough, intelligent enough to be able to tell everything that happened in the past, but unfortunately that's not so. I've known this child since he was a baby, he's never had any problem with his skeletal system prior to the time that his mother brought him to me with the complaint of pain in his leg. As everyone knows and as previously stated from this stand by Dr. Rhymes the condition can occur spontaneously. Little Dewey has always been overweight, but the fact that he's never had any problem with his skeletal system prior to this and from the years that I've known him he's never been a complainer. I think that probably as a result of the original injury to his leg or knee as the case may be he probably developed this condition secondary to the trauma and I'm sure that the limp with the extra weight put on the joint aggravated the already weakened condition and thus caused the slipped femoral epiphysis."
Dr. Spence also testified regarding the characterization of Dewey's condition as a disease:
"Q. Doctor, there's been a lot of use of the word disease . . . when you use the word disease are you referring to the weakness that is inherent in the growth center in all young adolescent males?
A. Yes. Not disease from the standpoint that you would think a fracture is a disease or tuberculosis is a disease . . . it's changes that are going on within the body that, uh, may be an overgrowth at the time or . . . as the other attorney says a disorder in the standpoint of the development, uh, growth hormones and so forth . . . we really don't know.
Q. These changes that are going on in the body . . . these changes are common to all young adolescent males going through their growth cycle?
A. To one degree or another, yes, sir."
In interpreting an exclusionary clause, respect must be accorded to the well-established principle that the primary object of all insurance is to insure, and exclusionary clauses are strictly construed against the insurer. Commercial Capital Systems, Inc. v. Paille, 333 So.2d 293 (La. App. 1 Cir. 1976).
The plaintiff's claim for penalties and attorney fees under LSA-R.S. 22:657(A) is meritorious. The test for awarding penalties and attorney fees is whether the insurer withheld payment of the claim more than 30 days without reasonable grounds, such as would put a reasonable and prudent business man on his guard. Miller v. American Casualty Company, 263 So.2d 398 (La.App. 4 Cir. 1972), writ denied, 262 La. 1151, 266 So.2d 441 (1972). We are of the opinion that the action of the insurer in declining to pay the policy benefits must be adjudged to be "unreasonable" under the circumstances.
When an insurer chooses to resist liability based on a supposed defense, which a reasonable investigation would have proved to be without merit, it will be liable for statutory penalties. Matthews v. Coastal States Life Insurance Company, 291 So.2d 475 (La.App. 3 Cir. 1974).
An insurer must take the risk of its misinterpretation of its insurance policy. An erroneous interpretation of its policy where there is no substantial issue of fact does not constitute "reasonable grounds" within the meaning of the penalty statute, LSA-R.S. 22:657. Thomas v. Universal Life Insurance Company, 201 So.2d 529 (La.App. 3 Cir. 1967).
We can not believe that the appellant is seriously questioning the amount of the *1133 award as excessive. The medical expenses were stipulated to be in the sum of $3,270.33, and the exhibits in evidence clearly show that the policy limit is the sum of $3,500.00. The award of $3,270.33 is within the policy limits.
In view of the foregoing reasons, we affirm the judgment of the trial court at the costs of the appellant.[1]
AFFIRMED.
NOTES
[1] The appellee has requested an increase in attorney fees in his brief, but since he did not appeal or answer the appeal, we are unable to consider this request.